## BROWN *v.* SLEE.

A., the executor of the deceased member of a firm, entered into a contract in writing with B., the surviving partner, whereby he sold and transferred to the latter all the interest of the testator in the effects of the partnership for a valuable consideration, consisting in part of lands. The contract also stipulated that B. should, within five years from its date, if A. so desired, "purchase back" the lands at a certain price in cash. *Held*, that the respective rights and obligations of the parties under the contract were fixed when A., within the five years, duly notified B. to make the purchase at the expiration of them, and that, on tendering to B. within a reasonable time thereafter a proper deed for the lands, A. could maintain a suit for the stipulated price.

APPEAL from the Circuit Court of the United States for the District of Iowa.

The facts are stated in the opinion of the court.

The case was argued by *Mr. George G. Wright* and *Mr. Chester C. Cole*, with whom was *Mr. William M. Randolph*, for the appellant, and by *Mr. Charles C. Nourse* for the appellee.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

This is a suit in equity and presents the following facts: Prior to Aug. 6, 1870, Talmadge E. Brown and Jarvis Langdon were partners in business. On that day Langdon died, leaving a will, in which he appointed John D. F. Slee, Charles J. Langdon, Theodore W. Crane, Olivia L. Langdon, and Samuel L. Clemens, executors. On the 25th of April, 1871, the executors and Brown entered into the following agreement in writing:—

" The executors of Jarvis Langdon, deceased, for value received, hereby sell, assign, set over, and transfer unto Talmadge E. Brown all the right, title, and interest of J. Langdon, deceased, in or to the undivided property or assets of the late firm of T. E. Brown & Co., of Memphis, Tennessee.

" Subject, however, to all taxes and assessments thereon, now made or hereafter to be made, to all indebtedness therefor, and to all liabilities of said firm or any of the members thereof, for transactions in the business of the firm in tort and contract, and subject to all judgments against the said firm or any member thereof, recovered or to be recovered, and all costs, disbursements, officers and counsel fees, and all liability for contribution to any other partner or person in consideration of moneys paid or to be paid upon any liability of, from, and against all of which real or possible liabilities, and of, from, and against any other liability growing out of the transactions of said firm, said Brown agrees to fully indemnify and save harmless the executors, heirs, and next of kin of said J. Langdon, deceased.

" And said Brown further agrees to pay and discharge any just and legal claim of any person or persons whomsoever for any share of the profits or proceeds of the business of said firm, whether said claim be against the said firm or against the said Langdon, deceased, individually, and to fully indemnify and save harmless the executors, heirs, and next of kin of said Langdon of, from, and against any such claim; all the aforesaid agreements of indemnity to apply

not only to the liability growing out of the transactions of said firm, but also to any possible liability growing out of the transactions of the predecessors of said firm.

"Said Brown agrees to pay for such interest as follows:—

"*First.* Upon the assignment of the interest above mentioned twenty-five thousand dollars ($25,000) in cash, together with the further amount of fifty thousand dollars ($50,000) in notes, satisfactorily indorsed by B. F. Allen, or other satisfactory indorsers, and running from three (3) to eighteen (18) months at a fair average time from these extreme points of time mentioned.

"*Second.* A certain tract of land consisting of one hundred and thirty (130) acres, situated within the limits of the corporation of the city of Des Moines, Iowa, and also a certain plantation situated on the White River, in Arkansas, consisting of sixteen hundred (1,600) acres of land, and all the buildings, improvements, and appurtenances belonging thereto. In reference to the lands in Iowa and Arkansas, the purchaser hereby agrees that in five years from the date of this contract he will, if the estate or its legal assigns so desire, purchase back the lands for twenty-five thousand ($25,000) dollars, paying that sum in cash.

"This agreement is upon condition that the aforesaid two tracts of land are owned by said Brown in fee-simple, absolute, free, and clear of all taxes, assessments, and incumbrances of whatever nature, and that they shall, before this assignment shall be operative, be conveyed by full covenant deeds to the executors of said J. Langdon, deceased, said conveyances to be executed also by the wife of said Brown, and said executors to be furnished with properly authenticated abstracts of title thereof, showing the title thereof to be perfect and that they are free and clear of all incumbrances.

"The executors further agree that upon the final performance of this contract they will surrender certain notes now held by the estate against T. E. Brown, amounting to the sum of seventeen thousand dollars ($17,000), the aforesaid interest shall be assigned upon the execution of said contract and the delivery of notes, money, and deeds of the land as aforementioned.

"Said Brown is to have sixty (60) days within which to make the delivery and payments described in this contract.

"Dated 25th April, 1871.

"The estate of J. Langdon, per

        "J. D. F. SLEE, *Executor and Attorney.*

        "T. E. BROWN."

On the 25th of June, 1871, Brown paid the cash called for by the contract, gave his notes, and conveyed the Des Moines land to Charles J. Langdon. Thereupon the executors made to him the following assignment: —

"In consideration of one hundred thousand dollars this day received of T. E. Brown, as by the terms of our contract made with him, bearing date April 25, 1871, we, the executors of the last will of Jarvis Langdon, deceased, do hereby sell, assign, and transfer to said T. E. Brown all our rights and all the right, title, and interest Jarvis Langdon had in his lifetime in and to the property and assets of the firm of T. E. Brown & Co., at Memphis, Tennessee, subject to the terms and conditions of our said contract of April 25, 1871, above mentioned.

> "J. D. F. SLEE, *Executor.*
> "C. J. LANGDON, *Executor.*
> "T. W. CRANE, *Executor.*
> "SAMUEL L. CLEMENS, *Executor.*
> "OLIVIA L. LANGDON, *Executrix.*"

On the 3d of July, Brown took from Charles J. Langdon a lease of the Des Moines land for five years, and, for the use, agreed to pay the taxes and keep the premises in repair. Langdon, however, retained the right to sell the property, or any part of it, in which case the lease was to terminate, so far as it related to the property sold.

On the 30th of August the following supplemental agreement was entered into by the parties: —

"It is hereby mutually agreed by and between Talmadge E. Brown and J. D. F. Slee and others, executors of the estate of Jarvis Langdon, deceased, that said Brown need not perfect his conveyance to the plantation on White River, in Arkansas, as he is required to do by contract with said executors, dated April 25, 1871, but may, in lieu thereof, transfer and assign to said executors a certain judgment now owned by him against the county of Buena Vista, State of Iowa, on which there is due to him five thousand ($5,000) dollars, for the purposes named in said contract of April 25, 1871, said Brown to guarantee the collection of said judgment.

"It is further understood and agreed that if said executors desire it, said Brown shall, at the expiration of the five (5) years stated in said contract of April 25, 1871, repurchase the 130 acres of land in

the city of Des Moines at $25,000, the same as though the planta-
tion aforesaid was included therein.

"And it is further understood that if any of said Buena Vista
judgment shall within said five (5) years be paid to said executors,
they will allow interest thereon at the rate of seven (7) per cent
per annum, and the principal so paid may be deducted from the
$25,000 to be paid by said Brown for the repurchase of the Des
Moines property.

"In witness whereof, said parties have hereunto set their hands
this 30th day of August, 1871.

"J. D. F. SLEE, <em>Executor</em>,

"<em>And Attorney for the Executors of the Estate of J. Langdon, Deceased.</em>

"TALMADGE E. BROWN."

On the 30th of October, 1875, Charles J. Langdon wrote
the following letter to Brown, which reached him in due course
of mail:—

"ELMIRA, Oct. 30, 1875.

"T. E. BROWN, Esq., Des Moines, Iowa.

"DEAR SIR,— My wife's health is so poor that I am obliged to go
away with her, and I shall sail for Europe Saturday next, for an
absence of four, six, or eight months. I have left all necessary
papers for the closing of our matters, the re-deeding of the Des
Moines land and all other necessary business, with Mr. Slee. The
balance of $25,000, less what has been paid on Buena Vista County
judgment, will be due April 25, 1876, and we shall desire the money
at that time as per contract.

"Yours truly          C. J. LANGDON, <em>Executor.</em>"

To this letter Brown made no reply until May 26, 1876,
when he wrote as follows:—

"DES MOINES, 26th May, 1876.

"CHAS. J. LANGDON, Esq., Elmira, N. Y.

"DEAR SIR,— Your letter to me last fall in regard to the land
did not seem to require an early answer, and I have delayed it un
til now. I shall not be able to pay you the money this year, and
propose the following, which I trust will answer your purpose:
25th April, '77, $5,000.00 and a like sum on the 25th day of each
April following, all unpaid sums to draw six per cent per annum
from April 25, '76, the land to remain in your name until it is paid.
The last payment will be fractional part of $5,000, of course. This

is small interest, but interest must in future be less than it has been, and this is all I get on money that has been due longer than this has to you. There has been nothing paid on the Buena Vista judgment since remittance to you. The county are trying to have the same set aside for some informality or fraud, and may succeed, but I think not.

"Very truly yours, &c.,          T. E. BROWN."

On the 31st of May Langdon answered this letter declining the proposition, and on the 4th of June Brown wrote him as follows : —

"DES MOINES, 4 June, '76.

" C. J. LANGDON, Esq., Elmira, N. Y.

"DEAR SIR, — I am in receipt of your favor of the 31st May. You say the proposition does not suit you. This does not surprise me. I did not think it would. I am very sorry I cannot pay this money and take the land now. You must take such course in the matter as seems to your interest. I do not ask or expect you to be governed by what may seem to be mine.

"Yours, &c.,          T. E. BROWN."

On the 26th of June, 1876, the executors caused to be tendered to Brown a deed for the Des Moines land and demanded the payment of $23,381.14, and again on the 17th of July they tendered the deed accompanied with an assignment of the Buena Vista County judgment. The money not being paid, this suit was begun on the 19th of July to obtain a sale of the property to pay the balance that was due of the agreed sum of $25,000, and if the proceeds were not sufficient to pay the whole debt, to obtain execution for what remained unsatisfied.

Among the assets of the firm was a debt against one John S. Baldwin. This debt was originally contracted to Langdon, but afterwards, at the request of Langdon, the amount was transferred to the firm, Baldwin being charged and Langdon credited with it on the books. Baldwin became insolvent, and a part of his debt has never been paid. By way of defence to the original bill by the executors, Brown filed a cross-bill, in which he alleged in substance that when this account against Baldwin was transferred to the firm, Langdon individually guaranteed its payment in writing, and that in

consequence he was permitted while in life to draw large sums from the partnership. It was then averred " that the guaranty of the said Langdon was always recognized and treated by him (Langdon) as an individual guaranty, made upon his own personal account, and not as any part of the firm's business, or as necessarily or properly connected therewith. That at the time of the purchase of the interest of said Langdon's estate from his executors as hereinbefore stated, it was believed, or, at all events, there was a hope and a probability that something, at least, upon the balance due from said Baldwin's account, and possibly all might be collected, or in some manner realized from said Baldwin. And that said claim against said Baldwin was spoken of, and was the subject of conversation between the parties at the time of the purchase, and the same was not settled or adjusted or understood to be embraced in the terms of the settlement for the reason, among others, of the hope that the same might be realized in whole or in part from the said Baldwin.

" And your orator, therefore, distinctly avers, as a substantive and existing fact, that the claim upon Langdon's executors, by reason of that guaranty, was not embraced in said settlement, nor intended to be embraced, but was omitted therefrom for adjustment between the parties in case the said Baldwin should fail to pay any portion of said balance against him."

The contract between Brown and the executors, on which the original suit was brought, was made an exhibit to the cross-bill, and the prayer was that the estate of Langdon might be charged with what was due on the debt. The executors demurred to the cross-bill, and on the final hearing in the Circuit Court this demurrer was sustained and a decree rendered on the foregoing facts, finding due from Brown $26,320.37 for the repurchase, and ordering a sale of the property to pay the debt. From that decree Brown appealed.

There are two principal questions in this case, to wit: 1, whether, on the facts, Brown is bound to purchase back the Des Moines property and pay the balance of the $25,000 which remains after deducting the collections on the Buena Vista County judgment; and, 2, whether the demurrer to the cross-bill was properly sustained.

To our minds the fair construction of the contracts on which the case depends is that Brown purchased the interest of the estate of Langdon in the partnership property for $100,000 payable $25,000 in cash, $50,000 in notes, and $25,000 in the Des Moines land and Buena Vista County judgment, unless the executors concluded not to keep the land and the judgment, in which event he was at the end of five years to purchase them back and pay in money the $25,000 for which they were taken, the executors crediting him with what had in the mean time been collected on the judgment, with interest at the rate of seven per cent per annum.

This is not only the fair inference from the language of the contracts themselves, but it seems to have been the understanding of the parties as shown by their conduct at the time and since. Thus, on the 25th of June, although Brown did not then convey the Arkansas land, the executors made their transfer of the partnership property, "in consideration of one hundred thousand dollars" that day received. And when the Buena Vista County judgment was taken in lieu of the Arkansas lands, it was stipulated that all collections made within the five years should be credited with interest on the $25,000 if the executors desired the repurchase to be made. So when Langdon wrote Brown on the 30th of October, 1875, he said, "The balance of twenty-five thousand dollars, less what has been paid on the Buena Vista County judgment, will be due April 25, 1876, and we shall desire the money at that time as per contract." He thus treated what was to be paid as a debt which the executors desired to have met at maturity. Brown evidently looked on the transaction in the same way, for, in his letter written a month after the time for repurchase had expired, he made no objection to the failure to tender a reconveyance on the day, and demand the payment of the money, but said, "I shall not be able to pay you the money this year, and propose the following, which I trust will answer your purpose." Under these circumstances, all that was necessary to put on Brown the obligation to take back the land and pay the money instead, was for the executors to signify to him in some appropriate way that they had concluded not to keep it in satisfaction of the sum for which it was to be taken. This need not neces-

sarily be done on the day the repurchase was, under the contract, to be made. It was enough if at any time before the expiration of the five years the conclusion was finally reached and Brown properly notified. The reasonable presumption is that the parties expected the election would be made before the end of the time, because, as the money was to be paid on the day, some preparation would ordinarily be required to meet so large a demand. Time was material in the sense that the election must be made within the five years. If that was not done, the obligation of Brown to take back the property was gone. He was not bound to repurchase unless the desire that he should do so was expressed in proper form before the time elapsed.

We proceed now to consider whether the executors did in fact make their election in proper form and within the time. This depends entirely on the letter of Langdon under date of the 30th of October, 1875, and the reply of Brown of the 26th of May following. No particular form of election was provided for in the contracts. All they required was that the proper representatives of the estate should, within the time, express to Brown their desire that he "purchase back" the lands under the contract.

The letter of October 30 was written by Charles J. Langdon in his own name as executor, but he held the title to the property evidently with the assent of his co-executors. He wrote that he had left all the necessary papers with Mr. Slee, another of the executors, and concluded by saying that "*we* shall desire the money at that time as per contract." In what he did he was evidently acting for the estate, and as his acts have been adopted by all the executors as the basis of this suit, it is clear that his letter was at the time the expression of their will, and bound them so far as necessary to enable Brown to get the title from him if the money was paid as the contract required.

This letter did not in so many words say to Brown that the executors desired him to repurchase under the contract; but it did tell him they desired the money, which the contract called for only in the event of his repurchase. This could not be understood otherwise than as an expression of a desire that

he purchase back the property, under the contract. And evidently it carried that idea to Brown, for he immediately began to treat for terms, not because he claimed not to be bound, but because, to use his own words, he was "not able to pay." His conduct corresponded in all respects with that of the executors, and his letter is not to be treated as a waiver of the neglect of the executors to make their election at the day, but as a recognition of the fact that a proper election had been made and accepted.

It is claimed on the part of the appellants, however, that to enable the executors to recover they must prove "both an election to sell and the delivery or tender of a deed on the day fixed for performance." As we have already shown, it needed no tender of a deed on the day to require Brown to repurchase. It was enough if, before the expiration of the time, the executors made their election that he should do so, and signified it to him in proper form. That being done, the rights of the parties respectively under the contract were fixed. Brown became bound to repurchase and pay the money, and the executors to receive the money and reconvey. Either party could then require the other to perform, and neither could insist on the default of the other, so long as he was himself behind in his own performance. Brown could not demand a deed until he tendered the money, and the executors could not require the money until they had offered a deed. Neither party offered to perform on the day, and, therefore, one was as much in default as the other. Such being the case, either party, after relieving himself from his own default by performance or an offer to perform, could require the other to perform within a reasonable time. Neither could insist that the other had lost his rights under the contract until he had himself done what he was bound to do. The failure of both parties to perform on the day was equivalent to a waiver by each of the default of the other. The executors did offer to perform within a reasonable time after the day, and we think are entitled to recover.

As to the cross-bill. Upon this part of the case it must be assumed as a fact admitted of record, that when Langdon, the deceased partner, transferred his debt against Baldwin to the firm and got credit for it, he guaranteed in proper and legal

form its ultimate collection, and that it was taken on the faith of this obligation on his part. The only question, therefore, is whether, under the contract between Brown and the executors, that obligation was assumed by Brown, or, in effect, discharged. Brown took the assignment of the estate's interest in the firm property, subject, among other things, to all possible liabilities of Langdon for the transactions of the firm, and he agreed to indemnify the estate against all liability growing out of such transactions. The acceptance of the transfer of the Baldwin debt was a firm transaction, and the guaranty of Langdon grew out of that transaction. If the debt should not in the end be paid, the balance might be charged back to Langdon when the affairs of the partnership were closed up, and his interest in the good assets would be diminished to the extent of such a charge. The firm, as a firm, could not sue him on his guaranty. All that could be done would be to take his liability into account when settlements and divisions were made between the partners. This liability occupied a position in no material respect different, so far as winding up the affairs of the partnership were concerned, from an ordinary overdraft in the progress of the business. It was a liability to which Langdon was bound to respond at the proper time. If, instead of buying out the interest of the estate, Brown had wound up the affairs of the partnership and divided the proceeds, the balance due from Baldwin might have been set off to the estate as so much cash, but he could not have sued the estate directly on the guaranty. The liability was one that could only be enforced as an incident to the settlement of the business, and a statement of the accounts between the partners. The contract between Brown and the executors made such a settlement and such a statement of accounts unnecessary. Brown took the place of the estate in the partnership, assumed all its liabilities to or for the firm, and agreed to pay $100,000 to the estate for what would be distributable to it from the assets on a full and final adjustment of the accounts of the individual partners, and the reduction of all the assets to money. That was the evident purpose of the parties as expressed by the contract they made. The averments of Brown as to the obligations of the estate are contradicted by the terms of the written

instrument to which he refers, and on which the rights of the parties depend.   There is no allegation of fraud or mistake in reducing the contract to writing.   It follows that the demurrer to the cross-bill was properly sustained.

*Decree affirmed.*