### MATHEWS SLATE CO. v. NEW EMPIRE SLATE CO.

(Circuit Court, N. D. New York. June 3, 1903.)

1. VENDOR AND PURCHASER—CONSTRUCTION OF CONTRACT—LEASE WITH OPTION TO PURCHASE.

A lease of land under seal, also contained an agreement by the lessor, "in consideration of the sum of one dollar and other good and valuable considerations to it in hand paid," to sell and convey the premises to the lessee on the payment of a stated sum, "on or before three years from date." *Held*, that the contract of lease and the option to buy were separate and independent agreements; that the right of the lessee to exercise the option to purchase was not defeated by the service by the lessor of a notice terminating the lease for breach of its conditions, even if such termination was justified and effective.

2. SPECIFIC PERFORMANCE—CONTRACTS ENFORCEABLE—OPTION TO PURCHASE REAL ESTATE.

A contract in writing, under seal, by which one party, in consideration of one dollar, payment of which is acknowledged, agrees to sell and convey to the other certain lands and premises on payment by the other within a specified time of a stated price therefor, is valid and may be specifically enforced, the very thing contracted for being the right to a specific performance at the option of the purchaser.

3. LEASE—PERFORMANCE BY LESSEE—WAIVER OF NOTICE TO QUIT.

A lease of land for the purpose of quarrying slate thereon, which also gave the lessee an option to purchase at any time within three years, provided for the payment of a stated rental semiannually in advance, and also required the lessee to render a statement quarterly showing the quantity of slate produced during the preceding quarter, and to pay a royalty after deducting the fixed rental, if there should be an excess. It required the lessee to work the slate veins in an efficient manner, and as would best promote the interest of all parties, and gave the lessor the right to re-enter on the failure of the lessee to comply with any of its conditions. The lessee placed modern machinery and equipment on the premises, expended several thousand dollars in clearing an, abandoned quarry thereon of broken stone, and continued such work, as well as the taking out of slate, for something over two years, when he was served with a notice by the lessor terminating the lease for breach of its conditions. There had previously been delays in rendering the quarterly accounts, and at that time there was a considerable amount due in rents and royalties, but no serious objection had been made on that account by the lessor. On receipt of the notice the lessee caused a statement to be made, which was gone over by the parties and agreed to, and paid the royalties shown to be due and the rental to a time in the future. He continued the work, and subsequently rendered another statement covering the time to the end of the quarter in which the notice was given, and paid the royalties shown to be due, and the stated rental for six months in advance of that time, which was accepted by the lessor without objection. *Held*, that the lessor had waived the right

to insist on its notice, and that, even if performance of the lease by the lessee were a part consideration for the granting of the option to buy, he had reasonably performed so as to entitle him to exercise such option.

*In Equity.*

The bill in equity in this cause was filed in October, 1902, to compel the specific performance of a contract to convey a tract of land situate in Washington county, N. Y., close to the Vermont line, and known as the "Empire Farm," and which farm contains about 166 acres of land, and upon which there were, or were supposed to be, valuable slate quarries. The defendant claims that the contract or agreement was forfeited by the complainant prior to a demand for a deed and tender of payment and notice of forfeiture given; also that the agreement to convey was without consideration and unilateral, and that therefore specific performance cannot be decreed.

Selden Bacon, for complainant.

J. Sanford Potter, for defendant.

RAY, District Judge (after stating the facts as above). On the 1st day of September, 1899, the following written instrument was entered into between the New Empire Slate Company, defendant herein, as party of the first part, and H. H. Mathews, of Boston, Mass., as party of the second part, and same was duly signed and acknowledged by the parties, and recorded in the office of the clerk of the county of Washington, N. Y., on the 25th day of October, 1899, viz.:

"This lease and agreement made this 1st day of September, 1899, by and between the New Empire Slate Co., of Middle Granville, N. Y., a corporation organized under the laws of the State of New York, party of the first part, and H. H. Mathews, of Boston, Mass., party of the second part.

"Witnesseth: That the party of the first part for and in consideration of the rents, covenants and agreements hereinafter mentioned, to be kept and performed by the party of the second part, has and by these presents doth hereby lease and let unto the said party of the second part his heirs and assigns the entire slate veins running through its farm situate in the Town of Granville, N. Y.

"To have and to hold the same unto the said party of the second part his heirs and assigns for the uses and purposes only of working the slate veins and slate quarries on said farm, and taking and manufacturing therefrom, Roofing Slate, Mill Stock and Flagging, so long as suitable material for the same shall be found therein or until party of the second part shall forfeit his rights under the lease by violating its terms.

"The party of the second part, in consideration of the premises, for himself, his heirs and assigns, covenants, promises and agrees to and with said party of the first part, its successors and assigns, that—

"First. He the said party of the second part, his heirs and assigns, will from the date of this lease work the quarries and slate veins on said premises in a good workmanlike and efficient manner, as will best promote the interest of all parties.

"Second. That as soon as reasonably may be he will put into and upon said premises, and use in connection with the quarries thereon, the necessary machinery for fully developing and working said slate veins and quarries according to the modern plan and custom of working quarries.

"Third. That during the continuance of this lease, on or before the 10th day of every January, April, July and October in each year, the said party of the second part, his heirs and assigns, shall make and render to the said party of the first part, its successors and assigns, a true and accurate account in writing, of all roofing slates, mill stock, and flagging, made from the quarries on said premises during the previous quarter, which account shall

also show the amount of roofing slates, mill stock or flagging, taken or·shipped from said premises during such months and the amount on the bank of said quarries at the end thereof. ·

"Fourth. That said party of the second part, his heirs and assigns, shall pay said party of the first part, its successors and assigns, during the continuance of this lease, as rent, the annual sum of three hundred dollars, payable as follows:

"One hundred and fifty dollars on the 1st day of October, 1899, and one hundred and fifty dollars on each first day of April and first day of October, hereafter. Operations under this lease to begin October 1st, 1899.

"That in case the proceeds of said quarry during any three months, commencing October 1st, 1899, shall be so large that a royalty of fifteen (15) cents for each and every square of first quality roofing slate and ten (10) cents for each and every square of second quality roofing slate made from said premises during said three months and of one-half a cent for each and every square foot, mill measure, of mill stock and flagging, made from said premises, during said three months shall or would exceed the sum of seventy-five dollars, the amount of rental for three months as above reserved, then and in that case, said party of the second part shall pay to said party of the first part, its successors or assigns, in addition to the annual rental, the amount of such excess, the same to be paid at the end of each quarter commencing October 1st, 1899, or as soon thereafter as the slate or stock is sold.

"It is further understood and agreed by and between the parties to this lease, that the party of the first part reserves to itself, its successors and assigns, all uses, rents and profits of said premises and the right to the trees and wood excepting and not inconsistent with the quarry uses and purposes aforesaid. Also, that in case parties of the second part, his heirs or assigns, shall fail to keep or perform any of the premises, contracts or agreements herein contained and by them to be kept, done or performed, it shall be ·lawful for the said. party of the first part, its successors or assigns, forthwith at its option, to terminate this lease, and without notice, to re-enter upon and possess itself of the premises hereby demised, anything herein contained to the contrary thereof, notwithstanding.

"Said party of the first part, also grants to the said party of the second part, his heirs or assigns, the use of the right of way from said premises to the railroad switch on the company's property, during the continuance of this lease, also, the use of the right of way from the premises hereby leased to the highway. In the event of the termination of this lease from any cause whatever, the party of the second part shall have the right, if all the obligations to the party of the first part, under this lease have been complied with, to. remove any stock or appurtenances belonging to them on said premises. ·

. "It is understood and agreed between the parties hereto, that in the event of a continuous cessation of the working of the quarries by the party of the ·· second part as herein stipulated, for the period of one year, the party of the first part, may at its option terminate this lease as herein provided.

"Party of the first part, in consideration of the sum of one dollar and other good and valuable ˙considerations to it in hand paid by the party of the second part, hereby covenants and agrees to sell and convey unto said party of the second part, his heirs or assigns, the fee simple of said farm and premises, containing about 166 acres of land more or less, with the appurtenances, free and clear of all incumbrances, upon the payment to it by the said party of the second part, his heirs or assigns, of the sum of twenty thousand dollars, on or before three years from date. Said conveyance shall be made by a good and sufficient warranty deed containing a general warranty and the usual covenants.

"In witness whereof the parties hereto have hereunto set their hands and seals the day and year first above written.       New Empire Slate Co.,

                                        "W. H. Kirtland, Prest.
                                        "H. H. Mathews."

On or about January 29, 1894, the complainant, the Mathews Slate Company, was duly organized and created a corporation under and

by virtue of the laws of the state of Maine, and thereafter and on or about the 14th day of March, 1900, it procured from the Secretary of State of the state of New York, in accordance with the laws of said state, a certificate that it had complied in all respects with all the requirements of law to authorize it to do business in the state of New York. Its business was and is buying, selling, leasing, and otherwise dealing in real estate, slate and other quarries, etc., and the complainant is, and at all times since its obtaining said certificate has been, duly authorized to do business in the state of New York. Under and by virtue of the laws of the state of Maine and its charter, the complainant had full power and authority to take, acquire, and hold any and all real estate, either within or without the state of Maine, necessary, proper, or convenient for the conduct of its business or its corporate purposes, and the property mentioned in said written instrument was necessary, proper, and convenient for the conduct of its business and corporate purposes. On or about the 13th day of January, 1900, and subsequent to the organization of the complainant as a corporation, the said Henry H. Mathews, for a valuable consideration, duly paid, duly assigned, transferred, and set over unto the complainant the said written instrument, and all his rights and interests therein, and in the premises therein described, by a certain deed of assignment of that date, which was duly recorded in the office of the clerk of Washington county, N. Y. Immediately after the execution of said instrument the said Mathews took possession of the property described in the said written instrument, and on the execution of the said transfer by him to the complainant he placed the complainant in possession of the said property.

This farm is oblong, being about twice in length east and west its breadth north and south. The central third is a low meadow, containing, so far as known, no slate beds. On the eastern end is a knoll about 100 feet high, and on the western end is a hill about 500 feet in height. It was known there were outcroppings of slate in the eastern knoll, but these had not been worked. On the western ridge, and about 150 yards distant from the meadow, was the Big Quarry of the Old Empire Quarry. This was reached, it seems, by a pit dug through the solid rock, which at the time the instrument was executed was filled with broken and crushed rock. To the southwest of this were two other openings or quarries well filled and choked with rock, etc. At the top of the hill, and some 300 or 400 yards west of the Old Empire Quarry, and 350 feet higher up, was a fourth opening, about 40 feet in diameter and 50 feet deep, known as the Empire Green or Jack Hughes opening. This was nearly filled with broken rock which had been dumped into it. Southwest of this was still another and a much smaller opening in a similar condition. As a quarry, the whole place had been abandoned for many years. The last work done of any importance was at the Jack Hughes opening, in 1886 or 1887. No efficient or profitable work in quarrying could be done until these old openings were cleared out or new ones made. These conditions were known to the parties, and it is self-evident that they contracted with reference to them, and that neither party contemplated the immediate production of slate, or the immediate opening and continuous

working of all the old quarries. There is no stipulation in the agreement of that nature.

Very soon after the execution of the agreement, September 1, 1899, Mathews took possession of the property leased (it will be noted that the owner retained the use and possession of all except the quarries), and commenced preliminary work. By March, 1900, one complete steam quarrying plant of modern type, and with modern equipment, was erected, and from that time until February 15, 1902, the complainant or its assignor was constantly at work in the quarries, keeping an average of about 30 men constantly at work, and gradually increasing the equipment. During this period the work done was wholly in the old large quarry, the Big Empire, but at three different points therein. In February, 1902, the complainant had in operation two complete self-dumping cable plants and one derrick run by horse power. Fully one-half the work done prior to February 15, 1902, consisted in the removal of some 50,000 or 60,000 tons of broken rock, débris left in the quarry by former operators, all work necessary to be done, and during the time mentioned at least $14,000 of day wages was paid to men at work in putting the quarries in workable condition. Because of the condition of the quarries, little or no slate was produced prior to July 1, 1900, and until after October 1, 1900, not enough slate was produced to call for royalties above the minimum rental of $150 each six months. The rent for the first six months (October 1, 1899, to April 1, 1900) was paid on the execution of the lease October 6, 1899. The rent for the second six months (April 1, 1900, to October 1, 1900) was paid May 8, 1900, and the rent for the third six months (October 1, 1900, to April 1, 1901) was paid March 5, 1901.

There was great irregularity in the rendition of statements of slate quarried. The last statement prior to February 17, 1902, was apparently rendered August 24, 1901. The minimum rentals due April 1, 1901, and October 1, 1901, in advance were unpaid February 17, 1902, but by a course of dealing allowing the matter to run in this way, without a demand for payment or an account, the parties seem to have waived strict performance in this respect.

On the 15th day of February, 1902, the complainant stopped work at the quarries, and did not resume until April, 1902. On the 17th day of February, 1902, the defendant served a notice that it claimed that the lease was forfeited. That notice is as follows:

"To H. H. Mathews and to the Mathews Slate Company of Boston, Mass., and their assignees and employees: Take Notice: That under and by virtue of the provisions of the lease from the New Empire Slate Company of Middle Granville, New York, to H. H. Mathews of Boston, Mass., bearing date the 1st day of September, 1899:

"That the said New Empire Slate Company has exercised and does hereby exercise 'its option to terminate this lease and to re-enter upon and possess itself of the premises demised' for the reasons that the said H. H. Mathews and his successors in interest, have failed to keep and perform their 'promises, contracts and agreements' in said instrument set forth as follows:

"1st. They have neglected and omitted to render 'on or before the tenth day of January, April, July, October in each year a true and accurate account, in writing, of roofing slate, mill stock, flagging made from the quarries on said premises during the previous quarter,' etc.

"2nd. They have failed to pay to the party of the first part the 'annual sum

of three hundred dollars ($300.00)—one hundred fifty dollars ($150.00) on each first day of April and first day of October' and have paid no royalties or rentals of any kind since October 1st, 1900.

"3rd. They have neglected and omitted to, from the date of the lease 'work the quarries and slate veins on said premises in a good, workmanlike and efficient manner' as to best promote the interests of all parties.

"And you are hereby notified that all rights and privileges conveyed and contracted under said instrument have become forfeit and are hereby terminated.

"Dated the 17th day of February, 1902.     New Empire Slate Company.
                                       "Hugh Williams, Secretary."

In January or the early part of February, 1902, the selling price of slate had advanced about 25 per cent. This, of course, increased the value of these slate quarries, of the lease, and of the option of purchase, both contained in the same instrument.

The complainant, on receiving the notice above set out, took prompt steps to cure and remedy, so far as within its power, the matters complained of. About April 1, 1902, the complainant again opened work in the quarries. On the 25th day of February, 1902, a statement of all slate, mill stock, and flagging made to November 1, 1901, was made and agreed upon between the lessor and lessee. Including the minimum rents due April 1 and October 1, 1901, and covering the year from April 1, 1901, to April 1, 1902 (and waiving all matters and questions of the sale or nonsale of the product), there was found due, of rents and royalties at that time, for such period, $721.95. By error, mutual it would seem, an item of $15 was overlooked, and the statement rendered made the amount due $706.95, and a check of this amount was given by complainant and accepted by defendant February 25, 1902, to square the account. The $15 was paid in April following. The defendant gave a receipt for the $706.95, which reads as follows:

"G. Myron Allen.                                     Hugh Williams.
     "Allen & Williams, Quarriers and Manufacturers of Superior Red
                              Roofing Slate.
                    "Middle Granville, N. Y., Feby. 25th, 1902.
     "Received of Mathews Slate Co., seven hundred & six $95/100 in full for royalty to November 1st, 1901.
     "$706.95.                                  New Empire Slate Co.,
                                            "H. Williams, Sec."

While Mr. Williams, the secretary of the defendant, claims that he did not understand that the figures he went over with the complainant at the time of this settlement, about February 25, 1902, included advance payments up to April, 1902, it is hardly credible that under the circumstances he would have gone over these figures for the purpose of getting at the amount due up to certain dates without knowing and understanding what payments were being made and the time covered by such payments. The evidence is conclusive that this $706.95 paid on the 25th of February, 1902, not only paid the rental up to the 1st of April, 1902, but the additional royalty on all slates made to November 1st, whether shipped or not.

In the early part of April, 1902, Mr. Mathews sent another statement to the defendant, and April 22d a corrected statement was sent. The statement of April 1, 1902, specially mentions dates up to April

122 F.—62

1, 1902, and the amount as due is stated to be $214.10. A check for this amount was inclosed. April 22d the complainant wrote the defendant:

"Enclosed please find statement of all royalty due on slates made at Empire Quarry from Nov. 1st, 1901, to April 1st, 1902, and on all mill stock made from Oct. 1st, 1901, to April 1st, 1902, amounting to $214.10 for which we enclose our check. Yours respectfully,      The Mathews Slate Co.,
"C. W. B."

The check was inclosed, received by the defendant, indorsed by it, and the money collected. That the defendant understood what it was doing and what was being done cannot be questioned.

After these transactions were closed, and April 29, 1902, the defendant wrote the complainant insisting on a forfeiture of the lease, but saying nothing about the option, nor had any forfeiture of the option been declared. In the meantime the complainant went on working the quarries and extending the business.

This court is of the opinion and holds, while not setting out all the evidence bearing on the question, that the defendant well knew it was accepting payments reaching on beyond the date of the notice declaring the forfeiture of the lease, and that it accepted these payments after the service of such notice with full knowledge of the fact. This court is also of the opinion and holds that probably the defendant did not understand the legal effect of these acts. The defendant waived and intended to waive the noncompliance with the strict terms of the agreement so far as there had not been a strict compliance, but had it in mind still, while accepting these benefits and payments after the notice declaring the forfeiture, to insist that there had been a forfeiture. In other words, the defendant intended to get all the money and all the benefits it could and take advantage of the service of the notice in addition.

The check of $214.10 paid the balance of royalty for the quarter ending December 31, 1901, the royalty for the quarter ending March 31, 1902, the $15 item overlooked in February, and $150 minimum rental due April 1, 1902, in advance for the six months from April 1, 1902, to October 1, 1902.

This action was brought and much time was expended in taking evidence, and near the close of the taking of testimony, and on the 6th day of February, 1903, the defendant, evidently having discovered its situation, offered on the trial as follows: "The defendant here and now offers to repay to the Mathews Slate Company all the moneys paid by it to the Empire Company for or on account of any rents or royalties accruing after February 15, 1902, and hereby tenders the amount to Mr. Mathews on the stand as stated by him in his testimony, $160.53." This offer was refused.

Before the commencement of this action the complainant duly tendered to the defendant the sum of $20,000 and demanded a deed of the premises. This was done within three years from the date of the option. The defendant refused the tender, and has never accepted it, and refused to give a deed, and this action is brought to compel specific performance of the obligation created by the instrument already set out in full.

The written instrument signed by the parties or by the defendant and the complainant's assignor is divided into two parts, each complete in itself and independent of the other. First, we have a complete and perfect lease of these premises, with mutual obligations and agreements; and, second, we have a complete option for the purchase of these premises, and by the terms thereof, on the payment of the sum of $20,000 on or before three years from date, the defendant was to convey by a good and sufficient warranty deed, containing a general warranty and the usual covenants, the premises mentioned.

By the terms of this agreement the complainant or his assignor at ,any time after the agreement was signed, on tendering the $20,000, was entitled to a conveyance of the premises, and the complainant's right to this conveyance was in no way dependent upon the performance or nonperformance of the terms and conditions of the lease contained in the same instrument. This instrument was under seal and recites a consideration of $1 and other good and valuable considerations to it in hand paid by the party of the second part as the consideration of the option. It is probable that the parties to this agreement had in mind the leasing as a part of the consideration; but this is by no means certain, and the rights of the complainant to a conveyance under the terms of this option cannot be made to depend upon a performance or nonperformance of the agreements contained in the lease.

It seems clear that, if the defendant has sustained damages by reason of the nonperformance of the lease provisions contained in the agreement, it has its remedy in a suit for damages. Its obligation to convey is not made dependent upon the performance or nonperformance of the lease provisions, but upon the due tender of the $20,000 in consideration of the payment of which it covenanted and agreed to convey the premises.

It is claimed by the defendant that in this option there is no mutuality, and therefore specific performance cannot be enforced. It seems to be settled law that "the rule that want of mutuality in the right to specific performance will prevent enforcement by one party has no application to a contract which is an option to sell real estate at a specified price." Watts v. Kellar et al., 56 Fed. 1, 5 C. C. A. 394. In that case the Circuit Court of Appeals said:

"An option to sell land is as valid as an option to buy. When one holding a buyer's option makes his election to purchase, and tenders the money according to the terms of the contract, it is the duty of the seller to accept the price, and execute a deed to the purchaser for the property; and when one holding an option to sell elects to make the sale, and tenders a deed, it is the duty of the buyer to accept the deed and pay the price. Such contracts are perfectly valid, and it is now well settled that a court of equity may decree a specific performance of them. A suit for that purpose is, of course, subject to the general rule that the specific enforcement of contracts for the purchase or sale of land is not a matter of course, but rests in the discretion of the court, in view of all the circumstances. But the rules by which the court will be guided, in a suit like this, in decreeing or refusing a specific enforcement, are the same that they are in other suits for the specific enforcement of contracts relating to land. Cases may be found which hold that such contracts will not be specifically enforced, because the right to a specific enforcement is not mutual. The want of mutuality of right to a specific performance of a contract, which sometimes precludes its

enforcement in equity, has no application to an option contract of the char-- acter we are considering. The purchaser of an option to buy or sell land pays for the privilege of his election. It is that very privilege which the other party to the contract sells. In the absence of an agreement to the contrary, each party to a contract to buy or sell land may have it specifically enforced against the other; * * * but the very purpose of an optional contract of this nature is to extinguish this mutuality of right, and vest in one of the parties the privilege of determining whether the contract shall be vitalized and enforced. An option to buy or sell land, more than any other form of contract, contemplates a specific performance of its terms, and it is the right to have them specifically enforced that imparts to them their usefulness and value. An option to buy or sell a town lot may be valuable when the party can have the contract specifically enforced, but if he cannot do this, and must resort to an action at law for damages, his option in most cases will be of little or no value. No man of any experience in the law would esteem an option on a lawsuit for an uncertain measure of damages as of any value. The modern, and we think the sound, doctrine is that when such contracts are free from fraud, and are made upon a sufficient consideration, they impose upon the makers an obligation to perform them specifically, which equity will enforce."

The court cites Pom. Cont. §§ 167–169, and notes; Willard v. Tayloe, 8 Wall. 557, 19 L. Ed. 501; Brown v. Slee, 103 U. S. 828, 26 L. Ed. 618; also Raymond v. Land & Water Co., 4 C. C. A. 89, 10 U. S. App. 601, 53 Fed. 883.

In Pomeroy on Contracts, p. 235, in a note to section 167, the author says:

"That a contract may be binding and enforceable in equity, although there is no mutuality of obligation resulting from the express terms of the instrument, is plain from the following very familiar examples: A covenant to stand seised is purely a unilateral obligation, but will be enforced. A covenant to convey on the payment of a sum of money (like the ordinary bond to convey) is binding, and will be specifically enforced, on the assent or acceptance of the one to whom the covenant is made, although he does not, by any terms of the contract, or by any promise, bind himself to pay the money. Ewins v. Gordon, 49 N. H. 444; Jones v. Robbins, 29 Me. 351, 1 Am. Rep. 593; Barnard v. Lee, 97 Mass. 92; Calvert v. Gordon, 1 Man. & Ry., 494; 3 Id. 424. Such a promise need not be under seal. A written offer to sell or lease or convey land at a certain price becomes binding and enforceable, if assented to before it is withdrawn by the party to whom it is made. Boston & Me. R. R. v. Bartlett, 3 Cush. 224; Mactien's Adm'rs v. Frith, 6 Wend. 104, 21 Am. Dec. 262; Corson v. Mulvany, 13 Wright, 88, 99; Perkins v. Hadsell, 50 Ill. 216."

This court is of the opinion that if two persons enter into a contract in writing under seal, by which the one party, in consideration of $1, the payment of which is acknowledged, agrees to sell and convey to the other party within a specified time certain lands and premises, on payment by the other party of a specified consideration, such contract is valid and binding, and ought to be and may be specifically enforced. The seller has the right to fix his price, and covenant and agree that on receiving that price within a certain time he will convey the premises, and if within that time the purchaser of the option tenders the money and demands the conveyance he is entitled to it. To hold otherwise is to destroy the efficacy of such contracts and agreements. It frequently happens that a would-be purchaser is not certain that he desires to take a deed of certain premises, and still the option may be of great value to him; for if in arranging his business and carrying out other transactions he finds that he wants the land, and is willing to

pay the price fixed, he ought to have the benefit of a contract deliberately made. In the case now before the court the defendant deliberately and intelligently agreed, in a written instrument under seal, to convey these premises to the complainant's assignor or his assignee, at any time within three years, on receiving the sum of $20,000. Not a word is said or indicated that this conveyance is dependent upon the performance of the lease by either party, and, indeed, such a proposition is negatived by the fact that the complainant might have tendered the money and demanded the deed within an hour after the agreement was executed. The money has been tendered and the deed demanded. If the value of slate had gone down instead of up, it is not probable that the defendant would have declined to receive the money and make the conveyance. It may be that, if the price of slate had gone down instead of up, the complainant would not have exercised his option to purchase, and would not have tendered the money and demanded the deed. The defendant took his chances, and must have contemplated that if conditions were not favorable the complainant or his assignor would never demand a deed. The option agreement contains no provision relieving the defendant from his obligation to make the conveyance on the happening of any event, such as the increase in the value of the land, or the nonperformance of the lease agreement by the complainant or his assignor. The court is not authorized to interject any such provision into this agreement. Even if the performance of the lease provisions by the complainant was a part of the consideration for the option, this court is of the opinion that there was no failure of consideration, for there was a substantial compliance with its provisions, and in so far as there was default in the lease it was cured by subsequent performance and acceptance of such performance by the defendant. The complainant was not obligated to work the quarries and slate veins in such a manner as would best promote the interest of the defendant, but in such a manner as would best promote the interest of both parties, and it does not appear that he failed in this duty in any substantial matter.

In Fuller v. Artman, 69 Hun, 546, 24 N. Y. Supp. 13, the action was brought for the specific performance of an agreement to convey real estate. There was no mutuality of obligation or agreement, except that the vendee agreed, if he exercised the option, to take the property to pay the price agreed. That is this case exactly. Specific performance was decreed, and the judgment was affirmed. In that case the main defense to specific performance insisted upon was that there was no consideration. The agreement was under seal. The court held that while the mere presumption of a consideration, which arises from the use of seals in the execution of an instrument, is subject to rebuttal, the expression of a consideration in such an instrument is not subject to contradiction for the purpose or with the effect of invalidating the instrument; and the court cited, in support of this proposition, Murdock v. Gilchrist, 52 N. Y. 246; Rockwell v. Brown, 54 N. Y. 213. See, also, Grout v. Townsend, 2 Denio, 336.

The case of Palmer v. Gould, 144 N. Y. 671, 39 N. E. 378, is not an authority to the contrary. That case was decided upon the ground recited in the headnote.

There is no equitable ground calling for a refusal to decree specific performance in this case. True, the premises are worth more than they were when the agreement was executed; but there was no fraud or concealment of facts, and the defendant took its chances of an increase in the value of this land. The very work done on the premises by the complainant or its assignor has added thousands of dollars to the value of this property, and all the equities demand that specific performance should be decreed. The defendant insists that it would have received more royalties if the complainant had done more work and had proceeded more rapidly in opening and developing the quarries. This is undoubtedly true, but it is not a ground for denying specific performance so long as the complainant proceeded with due and reasonable diligence to open and develop the quarries, place machinery, and produce slate. In point of fact, no serious objection was made that the complainant was not proceeding in compliance with the contract in opening and developing the quarries and producing slate until the value of slate went up, and it became apparent that the premises were worth more than the complainant had agreed to pay therefor. Here seems to be the secret of the whole controversy.

This court is not disposed to speculate as to what might have been accomplished by the complainant had it proceeded in a different manner in working these quarries or had it followed a different policy. It is apparent that the complainant acted in good faith, and expended thousands of dollars upon this property more than it has received. After the notice of forfeiture was served the complainant rendered statements and made payments and figured up with the defendant, agreeing upon the amounts due, and all these payments were accepted. The complainant also proceeded without objection or question to employ more men and place more machinery upon the property.

The rule that waiver implies knowledge, and that one cannot be held to have forfeited any rights by reason of acts done in ignorance of the extent of those rights, and that a waiver, to be available, must be clearly and explicitly shown, and that there must be knowledge of all the material facts, and that a waiver of a condition in a contract never occurs unless intended by the party, or where the act relied upon ought in equity to estop the party from denying it, and that the waiver of a stipulation in an agreement must, to be effectual, not only be made intentionally, but with knowledge of the circumstances, are fully recognized and applied in this case.

The complainant tendered the purchase price, $20,000, and demanded the deed, on the 6th day of August, 1902. The defendant complains that it was not until January 30, 1903, that the complainant began to make slate in some of the openings. On the whole evidence, this court is of the opinion that the delay in opening and working some of these openings was not at all unreasonable. It would be unreasonable to expect that the complainant could have put these old and long-deserted and unused slate quarries in workable and paying condition sooner than was done. It might have been done, but the complainant had the right to consider all the

circumstances, its own financial ability, and its own interest, as well as the interests of the defendant in this action.

Courts of equity will not search with extreme diligence for technicalities upon which to base a forfeiture of a fair and equitable contract. Indeed, forfeitures are not specially favored in the law, although no court should hesitate to declare a forfeiture when one has actually occurred.

This contract and agreement was fair and equitable in all its terms and provisions, and based upon a good consideration. The complainant has substantially complied with all the terms and conditions of such contract and agreement, and in so far as there was not strict performance the defendant has waived the same. There has been no failure of consideration, and the complainant is entitled to a decree for a specific performance of the agreement to convey these premises.

It appears that there is a mortgage upon the premises to be conveyed, but the court has not discovered the exact amount of that incumbrance. The decree will contain a provision that the $20,000 be paid to the defendant on receipt of the deed and a cancellation of the mortgage in question, or that the deed given may be made subject to the lien of the mortgage, in which case the amount due thereon will be deducted from the $20,000.