# Richmond

SARAH ELLEN MITCHELL, AND OTHERS v. M. A. WAYAVE.

November 25, 1946.

Record No. 3115.

Present, Holt, C. J., and Hudgins, Gregory, Eggleston and Buchanan, JJ.

The opinion states the case.

*Leslie Hall* and *Alfred A. Hilton*, for the appellants.

*Oren R. Lewis*, for the appellee.

HOLT, C. J., delivered the opinion of the court.

This is a suit for specific performance in which the plaintiff has prevailed. Her claim covers two lots in Arlington county, the location and description of which are not in dispute.

On August 7, 1939, the owners of these lots, by contract under seal, leased them to Miss M. A. Wayave for a term of five years. The lessee was to pay by way of rent $40.00 a month. She was also given the right to renew this lease for an additional five years at the expiration of the first five-year period and was to pay by way of rent $65.00 a month on the second period. It was further provided:

"That if the lessee shall fail to pay said rent in advance as aforesaid, although there shall have been no legal or formal demand for the same, or shall neglect to perform or break any of the aforesaid covenants, then in either of these events, this lease and all things therein contained, shall cease and determine, at lessors option, provided that lessors shall first deliver to lessee written notice to remedy the default aforesaid within thirty days after such notice is received by the lessee, and if lessee fails to remedy the default complained of by the lessors, then, if the lessors do declare and deliver to the lessee written notice to quit the premises such notice

shall become effective upon the date declared by the lessors in said notice. And the lessors, their heirs or assigns, shall and may proceed to recover possession of the premises under and by virtue of the provisions of the Code of Laws of the State of Virginia, to regulate proceedings in cases between landlord and tenant.

"At the termination of this lease or any renewal thereof lessee shall remove within ninety days thereafter any improvements placed by him upon the premises or title thereto reverts to lessors."

On the same day the owners of this property, under seal, executed to M. A. Wayave an option contract containing this recitation:

"That for and in consideration of five dollars in hand paid to the owners, receipt of which is hereby acknowledged by the owners, and in consideration of that certain lease of even date executed between the parties hereto, and for other valuable and lawful considerations recited herein, and for other valuable and lawful considerations, the aforesaid owners hereby grant to the aforesaid buyer the exclusive option for five years from the date hereof, and during the five year renewal period hereby authorized to run concurrently with a five year renewal period of said lease, of purchasing those certain parcels of land hereinafter described, at the price and upon the terms hereinafter specified. If the aforesaid lease is cancelled for default the owners herein may by like notice cancel this option."

This option contract then goes on to state the price agreed upon if M. A. Wayave were to exercise her right to purchase:

"If this option to purchase is exercised by the buyer as herein authorized, then for the area designated by the buyer, the buyer shall pay as purchase price at the rates per square foot and upon the terms of payment as hereinbelow specified, it being agreed that not less than all of one of the said parcels may be purchased:

"During the first five years of this option:

Upon Parcel One: seventy five cents per square foot,

Upon Parcel two: sixty cents per square foot,
"During the second five years of this option:
Upon Parcel One: ninety five cents per square foot,
Upon Parcel two: eighty cents per square foot."

It further goes on to provide that if M. A. Wayave should elect to purchase she should pay to Virginia Abstract Title Company $100.00 and that when the abstract company certified that the title was good, upon delivery of a deed of general warranty, she should make payment to the owners one-fifth of the total purchase price and the balance in a manner definitely provided for.

Checks for the monthly rent of $40.00 were tendered, accepted and cashed up to the one of date May 10, 1943. Finally, a check for $440.00 of date May 17, 1944, which covered all of the $40.00 monthly rent due up to that date, was tendered and refused. When this last payment was actually made and accepted, the lessee sought by agreement to have her rent reduced, saying that war conditions had made payment difficult. Later increases in value of real estate made her anxious to avail herself of the benefits of her option, and by the same token the vendors were less anxious to comply with it.

The correspondence between these litigants is the best evidence of their attitude:

On May 9, 1943, Mr. A. R. Morrison wrote to Mr. H. W. Murrell that unless he could grant a moratorium, "the only thing that can be done is to accept your offer to cancel the lease."

On May 14, 1943, Mr. Murrell wrote to Mr. Morrison, saying that they would not change the lease but "If you want to be released from your obligation in the lease, we will do so, but would ask that you give us another letter to the effect, so that we will know definitely that you have vacated the property."

On May 16, 1943, Morrison wrote Murrell complaining of the high rent and enclosed a rent check.

On May 19, 1943, Murrell wrote to Morrison complaining of the fact that the rent check for April had not been received and discussed the possibility of selling these lots.

On June 12, 1943, Morrison wrote to Murrell, who was representing the defendants, saying:

"I delayed writing you because from day to day I thought there might be something favorable that I could write you. But the last chance faded out. It was necessary to accept your offer to terminate the leasehold, and it was thereby accepted, unless you can give me a fair break in the form of a moratorium until this emergency condition is over."

He further said that the lessee had already spent more than $1,000 improving this property. He further said:

"If you will grant a moratorium on rent I will continue to try to develop something and if I can get a rent will pay rent to you and when rent can not be obtained pay no rent to you during such period."

Finally, he said: "If the lease is cancelled I should be reimbursed first for the investment in improving the land."

On July 25, 1943, Morrison again wrote to Murrell, saying that he had received no reply to his letter of June 12, 1943, and that he was still making an effort to sell this property at an advantageous price, saying:

"Please let me know the best possible price insofar as you are concerned on a sale and also what you can do about the renting of the place during the emergency period."

On August 22, 1943, Morrison again wrote to Murrell and said that he would like to talk over the matter in person with him; that he was still carrying on negotiations about the sale of these lots, and

"Is it agreeable with you adjust and carry on with a rental of twenty dollars a month during the period that the laws prevent normal business efforts to be made? Much as one may want to do there are time when it is physically impossible to do for others as he would like to."

On August 27, 1943, Murrell wrote to Morrison that they were unwilling to reduce the rent to $20.00 a month and were unwilling to accept $10,000 for the larger lot, and were

not willing to sell either of these lots below the price which they had given them.

On September 25, 1943, Morrison wrote to Murrell, saying that the agreement which they had entered into and which was to be reduced to writing and sent to him had not been received, and that it was necessary to have it in hand before he could make any definite agreement with a contractor.

Afterwards, in September, Murrell wrote to M. A. Wayave care of Morrison, acknowledging receipt of rent check of date September 15, 1943, for $40.00 in payment of the May rent, and said:

"It is agreed that during the duration of the war and until armistice is signed, rentals as called for in the lease need be paid to Herman W. Murrell, agent for lessors, only to the extent of and when subrents are received by lessee. That is, during the time specified above the lessee shall not be obligated to pay any rent except that received by lessee as sub-rent, all of which is to be transmitted to the lessors at any time rent as called for in lease is not in a current condition."

On October 12, 1943, Murrell wrote to Morrison:

"We have considered carefully the proposition and plan presented to us in September regarding our two lots * * * we do not care to enter into any arrangement. * * * The monthly rental payments on the lots are considerably in arrears and even the two checks that you recently tendered to us would not get them in a current condition, so we are returning them to you herewith unused."

On October 17, 1943, Morrison wrote Murrell:

"I have just received your letter of October 12, 1943, in which you indicate that you have changed your mind about our agreement made when I was there in Salisbury. That was a perfectly fair agreement on the plan that you offered after a full discussion of the matter."

He further said that the agreement which they had entered into was a fair one.

On October 20, 1943, Murrell wrote to Morrison:

"My folks have decided that they are not willing to convey any portion of either lot until the lot sold is paid for in full. In other words, they are not willing to deviate in any degree from the original option given you some months ago. Neither are we willing to make any change in our lease agreement. We are, consequently, returning to you herewith the three checks for $40.00, $40.00 and $20.00.

"Since you have rented part of a lot to one tenant and have prospect of renting to another, if you wish to reinstate your original lease agreement, you may return the three checks mentioned and we will give you credit for same. If you want to continue on with the lease and wish us to allow $50.00 for work done on the lot, I wish you would kindly get in touch with my cousin, Rufus O. Jones, and ask him to O. K. your bill."

On December 15, 1943, Murrell wrote to his co-defendant, Rufus O. Jones, saying "it looks as if we are finally rid of Morrison." He denied that he had made any promises to Morrison and had only said that he would present Morrison's suggestion to his, Murrell's, associates.

On February 14, 1944, Morrison wrote to Murrell, saying:

"We were agreed that mutual responsibility continued under the lease, that there was no desire to avoid obligation under it. In the letter you wrote you stated our agreement on that, also that the lessee remained responsible until final adjustment of rentals in arrears was made. * * *

"It is desired that you consider and make your own offer now that you have the rental paid up in full.

"Enclosed are M. A. Wayave checks as follows:

| 588 | amount | $ 40.00 |
| 618 | " | 40.00 |
| 629 | " | 20.00 |
| 660 | " | 260.00 |
| | | 360.00" |

On February 16, 1944, Morrison wrote to Murrell complaining of the fact that Jones had taken down some signs

which he had put on these premises and that this interference by Jones made it difficult to collect rent from his sub-tenant.

On February 28, 1944, Murrell wrote to Morrison, saying:

"I don't know why you continue to *rite* and request modifications of the lease and option agreements executed in 1939, * * * "

He further said:

"I am accordingly returning you herewith the Wayave checks, as follows: No. 588, June 10, 1943, $40.00; No. 618, Sept. 15, 1943, $40.00; No. 629, Oct. 11, 1943, $20.00, and No. 660, Feb. 10, 1944, $260.00, totalling $360.00," and assigned as a reason therefor "I do not know at this time how much the rent is in arrears."

On March 10, 1944, Mr. Alfred A. Hilton, counsel for the defendants, wrote to Morrison and Miss Wayave, giving them 90 days to get off the place, and further said: "As you are already advised the lessors terminated your lease months ago."

On March 31, 1944, Mr. Oren R. Lewis, replying to Mr. Hilton's letter, denied that the lease had been terminated and enclosed a check of $440.00, covering the rent in full through the month of March, 1944, and also a check of $40.00 for the month of April, 1944.

On April 11, 1944, Mr. Hilton wrote to Mr. Lewis that, as directed by his clients, he was returning these checks.

Few who are not immediately interested will care to read this catalogue of claims, but it is a part of the day's work.

Application to the Trust Company to examine title was made on the 2nd day of April, 1944, and was completed by that company on April 7, 1944. The $100.00 provided for in the option contract was deposited with the trust company when application was made.

On April 11, 1944, counsel for the defendants wrote to counsel for the plaintiff that he was returning the check for $440.00 for the reason that the lease had long since expired, and that he had advised the abstract company that there was no contract for the sale of these premises and that

there was no occasion for it to proceed with the further examination of the title.

Mr. Murrell, called as an adverse witness, testifying said that in September, 1943, he presented to his associates the plaintiff's request for modification in the terms of the lease and that they refused to make modifications. He was asked:

"Q43. But they were willing to continue the lease and option at that time?

"A. If they would bring the payments up to date. I sent the checks back and told them to bring the payments up to date according to the original terms of the lease and then we would reinstate the lease."

He also said that the $440.00 check sent him and returned would have paid to date what was due by way of rental. Later he said that if back rents were paid, "we will reinstate the lease."

Defendants contend that the lease and option contracts are a part of one integrated whole; that the option cannot outlive the lease and is at an end when the lease is at an end. They further contend that the lease came to an end when the tenant stopped payment; definitely that it came to an end on May 10, 1943, when the last $40.00 monthly rent money was paid.

One answer to this is that Murrell, in his letter of October 20, 1943, recognized that the option was still in existence and had outlived the lease. He there said:

"My folks * * * are not willing to deviate in any degree from the original option given you some months ago."

It is conceded that contract conditions prerequisite to the cancellation of the lease were not met. Moreover, recognition of this lease and option is made in the letter of defendants' counsel of date March 10, 1944, where it is said:

"Pursuant to the provisions of the aforesaid lease and option, you and each of you are hereby given the ninety (90) days provided in said lease for the removal of any and all personal property belonging to you or either of you, or any such tenants whom you have permitted to occupy the said property."

In a note in 115 A. L. R. 376, it is said:

■ "The question whether a lessee's breach of his lease agreement causes a forfeiture of his right to exercise an accompanying option to purchase the property depends largely upon the intent of the parties in entering into the agreement—whether they intended that the option should form a part of the lease contract and whether the fulfilment of the covenants of the lease by the lessee was intended to constitute at least a part of the consideration for the option. Another important factor often considered in such determination is the question whether the lessor has manifested an intent to terminate the lease or has waived the breach."

See also, *Mathews Slate Co.* v. *New Empire Slate Co.* (1903; C. C. N. Y.), 122 F. 972.

■ From the correspondence we think it reasonably clear that the lessors manifested no settled purpose to terminate this lease until real estate had advanced in value. They did show a plain purpose not to reduce the rentals named in the contract of lease.

On April 29, 1944, these lessors filed a motion for a declaratory judgment, in which they charge that said lease and option had been cancelled. That motion was dismissed on a demurrer.

On November 24, 1944, these defendants filed a declaration in ejectment against M. A. Wayave and A. R. Morrison, and on April 6, 1945, they obtained a judgment therein.

An action for unlawful detainer is the usual procedure provided for by statute. Code, section 5448; 12 Va. L. Reg. 594; Burks Pleading & Practice, 3rd Ed., sec. 104.

This action of ejectment is mentioned in the petition for appeal but no assignment of error deals with it.

In *Parker* v. *Murphy*, 152 Va. 173, 146 S. E. 254, we said:

■ "It is settled in Virginia, that, in the absence of statute destroying the effect of a seal, an option contract under seal must be regarded as made upon a sufficient consideration, and no proof to the contrary will be received. *Watkins* v. *Robertson*, 105 Va. 269, 54 S. E. 33, 5 L. R. A. (N. S.) 1194, 115 Am. St. Rep. 880."

■ A decree for specific performance is addressed to the sound judicial discretion of the court. *Gish* v. *Jamison* (1898), 96 Va. 312, 31 S. E. 521, 2 A. L. R. 416 (note); 2 Minor's Inst. (3rd Ed.) 898.

■ That the premises have increased in value affords no ground for relief. *Mathews Slate Co.* v. *New Empire Slate Co., supra.*

The lessee in this instance appears to have spent something like $1,000 in improving this property. The evidence was heard *ore tenus*, and the same court which gave judgment in ejectment and dismissed a petition for a declaratory judgment gave judgment for the petitioner in this case.

The motion to dismiss because complainant has not brought suit in her true name is without merit. After the contract was made, she married Mr. A. R. Morrison. Indeed, in the action of ejectment she is named M. A. Wayave.

The decree appealed from should be affirmed, and it is so ordered.

*Affirmed.*

HUDGINS, J., dissenting.