**344 A.2d 367.**

FILOMENA UCCI, *Administratrix of the Estate of Louis Ucci vs.* JAMES MANCINI *et ux.*

JULY 22, 1975.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

KELLEHER, J. In this litigation[1] the plaintiff seeks specific performance of an option to purchase certain real estate situated in the city of Warwick, while the defendants in their counterclaim ask that the plaintiff be ordered to vacate the property and pay them damages. A jury-waived trial was held in the Superior Court. The trial justice ordered specific performance and dismissed the counterclaim. The defendants have appealed. Since the defendant wife had little or no connection with the incidents that have led up to this litigation, we shall hereafter refer only to the defendant husband and then by his last name.

The parcel of land in dispute is situated on the northerly side of Occupasstuxet Road. On September 29, 1964, Mancini leased the parcel to plaintiff's husband Louis. The husband operated a roadside fruit and vegetable stand on this location.

The lease had a 10-year term and called for a monthly rental of $175. It also gave plaintiff's husband an option to purchase the property at any time during a 5-year period beginning on July 1, 1968. The lease contained a series of covenants stipulating duties that were to be

---

[1]This is the second time this case has been before us. This appeal was originally heard by four justices with the Chief Justice not taking any part in its consideration. In June 1974, by a Per Curiam decision an equally divided court affirmed the judgment entered in the Superior Court. *Ucci* v. *Mancini,* 113 R. I. 261, 320 A.2d 334 (1974). Subsequently we granted the Mancini's motion for a reargument before the full court. *Ucci* v. *Mancini, supra.* At reargument it was discovered that the case was not ripe for appeal because the controversy involved multiple claims and there had been no compliance with the provisions of Super. R. Civ. P. 54(b). The case was remanded for a proper judgment on April 24, 1975, and thereafter it was returned to this court.

performed by the lessee. One covenant stipulated that the lessee obtain and maintain a public liability insurance policy which would protect himself and the lessors and that he deliver a copy of the policy to Mancini. The minimum coverage of the policy was to be $50,000 for one injury, $300,000 for one accident, and $25,000 for property damage.

Because plaintiff's husband also owned a wholesale fruit and produce business, he found it necessary to delegate the responsibility for the day-to-day operation of his Occupasstuxet Road venture to his brother Henry. Louis died in November 1965 and his wife was appointed administratrix of the estate. Mancini refused to accept the December 1965 rent unless and until plaintiff and her brother-in-law Henry entered into some sort of an agreement which would guarantee that Henry would continue to run the business. The necessary details were worked out. Henry took charge. The December rent was accepted and each payment made thereafter was accepted up through March 1968.

At that time plaintiff went to Mancini and told him that Henry was not living up to his agreement with her and that she was going to terminate his connection with the business. Mancini then declined to accept any more rent. When the April 1968 rent was tendered, it was refused. On May 7, 1968, a notice was sent to plaintiff telling her that because of her violation of several of the lease's provisions, the lease was terminated, and that she was to vacate the premises on or before June 1, 1968. One of the specified violations was plaintiff's failure to furnish the lessors with a copy of the requisite insurance policy. It is conceded that at this particular point in time plaintiff had failed to purchase the necessary insurance policy. The plaintiff did not vacate the premises and on August 19, 1968, plaintiff notified the lessors that she desired to

exercise the option to purchase the property. Mancini never acknowledged this attempted exercise. The plaintiff's attempts to pay the rent from April 1968 through December 1968 were fruitless. Sometime in the fall of 1968 plaintiff brought an eviction action against her brother-in-law Henry. On November 12, 1968, a judgment was entered in the District Court ordering the sheriff to deliver possession of the premises to plaintiff. The plaintiff initiated this suit in January 1969.[2]

In finding for plaintiff the trial justice rendered a very thorough and discursive bench decision. He found that the option was an integral part of the lease and that the lease permitted plaintiff as the administratrix of her husband's estate to exercise the option. The trial justice specifically found, however, that plaintiff breached the lease by her failure to insure the premises beginning on March 18, 1968. Mancini had taken advantage of this breach by notifying plaintiff on May 7, 1968 that this omission terminated the lease and ordering her to vacate the premises on or before June 1, 1968.

The trial justice ruled that plaintiff was a trespasser during the period of May 7 to June 1, 1968, but in determining her status from that point on, he found that Mancini's subsequent conduct was clearly at odds with his termination of the lease. Consequently, he held that Man-

---

[2]The records indicate that the plaintiff's fruit and vegetable business was a seasonal effort. During the summer of 1969, when she opened up the stand, the plaintiff discovered that her brother-in-law was running a fruit stand next door to hers. The plaintiff could not stand the competition as well as the harassment and she stopped selling in August. The following November, the Warwick building inspector determined that the plaintiff's stand was unsafe and notified Mancini to have it demolished. Mancini complied with the order. The plaintiff has, by a January 30, 1969 order of the court, paid into the registry the monthly rentals called for in the lease. Another order required her to pay to the defendants certain sums representing increases in taxes assessed against the property since her husband first began operations at this location.

cini by his later actions recognized plaintiff as the lessee and that therefore the option was properly exercised. The trial court acknowledged that if on August 19, 1968 plaintiff was something other than a lessee, her exercise of the option was a nullity.

The trial justice in finding a lessor-lessee relationship between the litigants in August 1968 relied on three incidents which occurred much later in that year. He referred to the November 1968 District Court eviction proceedings between plaintiff and her brother-in-law and the fact that Mancini, who was present during the trial, never questioned plaintiff's right to bring such a suit. Again in November 1968 Mancini came onto the property, removed a sign that had been placed there by plaintiff, and told her that the lease did not allow such a sign. In December 1968 Mancini complained that the location of Christmas trees that plaintiff was selling created a traffic hazard. The trial justice ruled that Mancini's silence at the District Court and the sign and tree episodes indicated to him that the lessor recognized plaintiff as holding possession under under the lease.

The defendant's appeal is limited to the narrow issue of whether these three incidents justify the invocation of a doctrine which we shall call, for want of a better phrase, "retroactive revivification" of a lease that had been terminated some 6 months earlier. We believe that they cannot.

One seeking specific performance of an agreement has the burden of establishing by clear and convincing evidence the propriety of the grant thereof. *DiBiasio* v. *DiFazio*, 103 R. I. 565, 239 A.2d 719 (1968); *Reed* v. *Rathbun*, 91 R. I. 421, 164 A.2d 387 (1960). Furthermore, in this controversy plaintiff, if she is to prevail, must show that the option was in full force and effect at the time she sought to exercise it. *Moore* v. *Northwest Fabricators, Inc.*, 51 Wash.2d 26, 314 P.2d 941 (1957).

It is well established that, although a lease gives a lessor an election to terminate a lease upon the lessee's default and to declare the term ended, unless the lessor makes a reentry or performs some other unequivocal act to terminate the lessor-lessee relationship, the lease will continue to remain in full force and effect. *Tseka* v. *Scher,* 135 Conn. 400, 65 A.2d 169 (1949); *Gradle* v. *Warner,* 140 Ill. 123, 29 N.E. 1118 (1892); *Shannon* v. *Jacobson,* 262 Mass. 463, 160 N.E. 245 (1928); *Padilla* v. *Sais,* 76 N. M. 247, 414 P.2d 223 (1966); 3 Thompson, *Real Property* §1111 at 382-83 (Replacement ed. 1959). In this jurisdiction a tenant who remains after having been given due notice of the termination of his tenancy and ordered off the premises, becomes either a trespasser or a tenant at sufferance. *Donnelly Realty Co.* v. *Langevin,* 78 R. I. 333, 82 A.2d 173 (1951); *Mathison* v. *Griffin,* 76 R. I. 16, 67 A.2d 833 (1949); *Union Trust Co.* v. *National Coal Co.,* 66 R. I. 485, 20 A.2d 373 (1941). This court has recognized that there may be instances when there is a waiver of forfeiture and subsequent revival of a lease. *Lenzini* v. *Gianetti,* 49 R. I. 174, 142 A. 139 (1928).

Although there are numerous cases[3] holding that a forfeiture has been waived in various circumstances, most of the circumstances involve the acceptance of rent after knowledge of a breach. Such decisions focus on the forfeiture of the lease rather than the question of whether the option was viable prior to the waiver. Most of the cases in which a waiver has been found and specific performance ordered concern an attempted exercise which occurred before the attempted termination of the lease.

Here, it is obvious that in August 1968, plaintiff was not

---

[3]A compilation of cases which discusses a lessee's breach and its effect on his right to purchase under an option can be found in Annot., 53 A.L.R.3d 435 (1973). The annotation is most informative with one exception. The exception, of course, is the issue presently before us.

Mancini's lessee. Since the trial justice found that the option was an integral part of the lease, it is exercisable only so long as the lease is operative. The converse of this proposition is also true—an option cannot be exercised if at the time the exerciser does not enjoy the status of a lessee. Assuming that the breach was waived some time in late 1968 the plaintiff has failed to prove that the lease was in effect on August 18, 1968, the date on which she notified Mancini of her intention to purchase his property.

The defendants' appeal is sustained, the judgment appealed from is vacated, and the case is remanded to the Superior Court with a direction to enter judgment for the defendants.

Mr. Chief Justice Roberts, concurring. I concur in the conclusion of Mr. Justice Kelleher. The facts as found by the trial justice disclose that the parties entered into a lease for the tract involved here for a period of 10 years, the term to begin on July 1, 1963, and to end on July 1, 1973. The lease contained provisions giving the lessee an option to purchase at any time after July 1, 1968. Among other covenants contained in the lease was one requiring the lessee to procure liability insurance and to provide the lessors with certified copies of the insurance policies. It further appears that from the beginning the rent was paid promptly through March of 1968.

The record further discloses that in March of 1968 the lessors became aware of the fact that the lessee had breached the covenant requiring her to provide insurance coverage on the property. Beginning with April 1968 the lessors refused to accept rent payments and continued to so refuse to accept rent throughout the entire period under consideration. On May 7, 1968, the lessors, acting through counsel, gave the lessee written notice to quit, directing her to vacate the premises by June 1. The lessee did not quit the premises but continued to occupy them

and on August 19, 1968, gave the lessors written notice of her intention to exercise the option. It is not disputed that in so doing she complied with the provisions of the lease relating to such action.

The basic issue presented here is whether, in the circumstances, the lessors by their action of May 7, 1968, terminated the tenancy and, if so, whether in so doing they terminated the option to purchase the property contained in the lease.

It is well settled that a breach of a condition or covenant contained in a lease does not automatically work a forfeiture and terminate the relationship of landlord and tenant. Rather, given such a breach, a lessor has an option either to terminate the tenancy or, in the alternative, to waive the right of forfeiture to which the breach gave rise and to retain the relationship of landlord and tenant. *Coward* v. *Fleming,* 89 Ohio App. 485, 102 N.E.2d 850 (1951); 3A Thompson on Real Property (1959 Replacement) §1327.

In numerous cases the question arises whether the lessor worked the forfeiture and terminated the tenancy or waived the forfeiture and continued the lease in effect. It is well settled that any act by a lessor which constitutes a recognition of the continuance of the relationship of landlord and tenant after he had knowledge of the breach will constitute a waiver of the breach. The general, and the better, rule, in my opinion, holds that where a lessor has an election to terminate a lease by reason of a default in a covenant contained therein and to declare the term ended, absent a reentry or some other unequivocal act on his part disclosing an intention to terminate the lease, the breach will be held to have been waived and the lease remain in full force and effect. *Gassert* v. *Anderson,* 201 Minn. 515, 276 N.W. 808 (1937); *Padilla*

v. *Sais,* 76 N. M. 247, 414 P.2d 223 (1966); *Mitchell* v. *Wayave,* 185 Va. 679, 40 S.E.2d 284 (1946).

I subscribe, then, to the proposition that while a breach of a covenant contained in a lease gives the lessor the right to work a forfeiture of the lease, it does not, in and of itself, void the relationship between the parties. In short, a forfeiture does not effect a termination of the tenancy, and in order for the lessor to avail himself of a forfeiture, he must within a reasonable time by such act or expression make clear his intent to work a forfeiture and to terminate the tenancy.

In the instant case the conduct of the lessors upon learning of the breach clearly discloses an intention on their part to terminate the lease. Having become aware of the breach in March of 1968, they refused to accept the rent beginning in April of that year and on May 7, acting through counsel, gave the lessee written notice to quit, directing her to vacate the premises by June 1, 1968. Nothing in the evidence would support any reasonable inference of a waiver of the breach on the part of the lessors. In such circumstances the lessee remaining on the premises after June 1 became either a trespasser or a tenant at sufferance. *Donnelly Realty Co.* v. *Langevin,* 78 R. I. 333, 82 A.2d 173 (1951); *Mathison* v. *Griffin,* 76 R. I. 16, 67 A.2d 833 (1949); *Union Trust Co.* v. *National Coal Co.,* 66 R. I. 485, 20 A.2d 373 (1941).

I turn, then, to the question whether the termination of the lease as of June 1, 1968, also terminated the option to purchase the property contained therein. It is generally held that where the lease and the option covenants and considerations are entire and indivisible and so interdependent, a continuance of the lease is essential to an enforcement of the option absent, of course, grounds for equitable relief from forfeiture. However, where covenants are divisible and not based on the same consideration

or an entire consideration and thus are independent, it does not necessarily follow that the option falls with the lease.

In the instant case the trial justice found that the option was an integral part of the lease and did not stand separate and apart therefrom. I agree with his conclusion and conclude that the option to purchase terminated with the termination of the lease. *Sandra Frocks, Inc.* v. *Ziff*, 397 Ill. 497, 74 N.E.2d 699 (1947); *London* v. *Tebo*, 246 Mass. 360, 141 N.E. 234, 29 A.L.R. 1037 (1923); Annot., 10 A.L.R.2d 884 (1950). It follows, then, that the lessee's purported exercise of the option to purchase on August 19, 1968, was without force and effect.

I am unable, however, to accept the view that once a tenancy has been terminated by the working of a forfeiture arising out of a breach of a covenant contained in a lease, it can be revived and, in particular, be revived as a result of a waiver by the lessor of action he had already taken to terminate the lease by reason of the forfeiture. I agree completely that a lessor can waive his right to work a forfeiture of the tenancy that accrued to him on the occurrence of the breach, but, in my opinion, a termination, once it has been accomplished, is final.

In 10 A.L.R.2d 884 at 886 there are a number of cases of earlier vintage in which the courts apparently adopted the view that the revival of a tenancy could flow from conduct constituting a waiver of a prior termination of that tenancy. However, a close examination of these cases is persuasive that while the courts were paying lip service to the doctrine of revival by waiver of a completed termination, they were in fact refusing to enforce an executed forfeiture where there were grounds that would indicate that to so do would be inequitable. *See Orange Motors, Inc.* v. *Meyer*, 107 N.J.Eq. 461, 149 A. 811 (1930).

I concede that in *Lenzini* v. *Gianetti*, 49 R. I. 174, 177,

142 A. 139, 140 (1928), this court held that "[a] forfeited lease may be revived by waiver even after entry for forfeiture." In so holding, the court specifically relied on *Coon v. Brickett*, 2 N. H. 163 (1819). Both *Lenzini* and *Coon,* in my opinion, while paying lip service to the doctrine of revival by waiver of the forfeiture, are really cases in which the court was refusing to give effect to a forfeiture on the ground that to do so would be inequitable.

In *Lenzini,* after a forfeiture had been worked, counsel for the lessor and the lessee entered into an agreement to settle certain claims. They agreed, as a part of the settlement, that the lessor would waive the forfeiture and restore the lessee to the tenancy. The court was of the opinion that in reaching the agreement the lessor intended to restore the plaintiff to all his former rights under the lease, specifically saying at 179, 142 A. at 141: "We are unwilling, however, to believe that Mr. Peterson intended to practice fraud upon Mr. Wildes and his client." In my opinion, the reference to fraud clearly discloses that the court was motivated in concluding to enforce the forfeiture on grounds of inequitable conduct.

It is true that in *Coon,* which was decided in 1819, there had been an entry and a forfeiture after a breach of the condition to pay the rent. Thereafter, the lessor accepted the rent but continued to exclude the lessee from further possession. The court noted that, the lessor having accepted the payment of the overdue rent, the lessee became entitled upon such payment to re-enter and occupy the premises, relying by analogy on an old English statute (4th George II.), which provided that a tenant who paid his rent and costs within 6 months after the ejectment shall be permitted to again enjoy the land under the old lease. The court further noted that to allow the lessor in such circumstances "to hold the land would be a deceit."

Considering the state of the record here, I cannot con-

clude that the trial justice in reaching his decision intended to deny enforcement of the forfeiture to the lessors on the grounds of inequitable conduct. Clearly, he based his decision on the inconsistency of certain conduct of the lessors engaged in in late 1968 with their intention to terminate the lease and, as I understand his decision, concluded that the sending of the notice to quit was insufficient to establish an intent to terminate the tenancy. If we were to approach it on the theory that we should deny enforcement of the forfeiture to the lessors, I am unable to point to anything in the record that would establish inequitable conduct on the part of the lessors.

I am of the opinion that we should rest our decision here on the finality of the termination. In so doing, we should, in my opinion, either repudiate the doctrine of waiver of a termination or otherwise distinguish *Lenzini* from the instant case. If we take this approach, it will become unnecessary for us to consider what the legal effect might have been of the conduct of the lessors during November and December of 1968.

Mr. Justice Paolino with whom Mr. Justice Doris joins, dissenting. I respectfully dissent from the conclusions reached by my brothers Joslin and Kelleher as well as from the result reached by the Chief Justice in his concurring opinion. In my judgment the evidence supports the findings of fact made by the trial justice and I am convinced that he applied the correct rule of law. Indeed, in my opinion, the cases cited by the Chief Justice support my conclusion that the decision of the trial justice is correct and that the judgment entered pursuant thereto should be affirmed.

*Joseph F. Penza, Jr.,* for plaintiff.

*William F. Hague, Jr.,* for defendant.