Helen Wood DOYLE

v.

John W. McNULTY et al.

No. 82–129-Appeal.

Supreme Court of Rhode Island.

July 20, 1984.

Paul M. Chappell, Dolbashian, Chappell, Chace & Forte, Portsmouth, for plaintiff.

Kathleen Managhan, Corcoran, Peckham & Hayes, P.C., Newport, for defendants.

OPINION

KELLEHER, Justice.

In 1925 Herder C. Wood (Wood) took title to two lots in Portsmouth, Rhode Island,

from the Narragansett Heights Realty Co. (the realty company). Wood held title to these two lots (which we shall hereinafter refer to as lots 20 and 21) as trustee for a Patrick Ashe and Wood's two daughters, Helen and Ruth.

The deed conveying these two lots from the realty company to Wood contained six restrictions. Five of them pertained to use of the land. They prohibited the sale or manufacture of intoxicating liquors, required the installation of flush toilets, required that all chimneys be made of brick, prohibited the building of anything other than a cottage or a dwelling, and prohibited stores of any kind.

Restriction number 4 has precipitated this litigation. It reads as follows:

"Should said grantee ever decide to sell said premises, said grantor shall have the prior right to purchase same on the basis of the same price paid by said grantee plus an amount equal to a sum which would accrue were the money invested at a reasonable rate of interest."

Later, in 1933, the realty company conveyed thirty-nine more lots of land directly to Helen and Ruth. These lots were not subject to the restrictions described in the 1925 deed. Patrick Ashe conveyed his interest in lots 20 and 21 to the sisters in 1941.

Having suffered financial setbacks during the Depression, Helen, by her own admission, never paid any of the taxes assessed on the Portsmouth property. Consequently, in 1948 the sisters and their spouses conveyed all their interest in the forty-one lots to Ruth and her husband, George Ensworth, as tenants by the entirety.

The 1948 conveyance contained the following language:

"The said premises being subject to certain restrictions contained in the deed of Narragansett Heights Realty Co., Inc. to Herder C. Wood, Trustee, dated November 25, A.D. 1925, recorded in said Land Evidence in Book 32 at p. 528."

Time marched on, and in 1977 Ruth, now a widow, agreed to sell to John McNulty and his wife for $65,000 thirty-seven of the thirty-nine lots she and her sister had acquired in 1933. When Helen, also a widow, learned that this transaction had been consummated, she initiated this litigation. In her complaint Helen claimed that the 1948 deed's reference to the 1925 restrictions bestowed upon her the right of refusal that had been retained by the realty company when it first conveyed lots 20 and 21 to her father as trustee.

At the time of the trial in June of 1980, Helen was eighty-seven years old, and her sister Ruth was eighty. Helen testified that in July 1948 when she and her spouse conveyed whatever interest they had in the forty-one lots to Ruth and her spouse, she was assured by Ruth that she would have the right of first refusal before any of the lots were sold to a third person.

Ruth, on the other hand, denied that any such promise had been made. She also explained that at one time she and her husband owned their own home in Westfield, Massachusetts, but at her father's urging gave up their home to take up residence in the family homestead occupied by her ailing father and Helen. Her father, because of the 1929 Depression, had suffered severe financial losses; matters had reached the point that the bank was threatening to foreclose the homestead's mortgage, so she and her husband paid all of the expenses involved in the maintenance and upkeep of the property. Ruth told the trial justice that sometime in 1948 Helen and her husband (the couple was married in 1947) not only signed away all of their interest in the Portsmouth property but also conveyed to Ruth whatever interest they had in the family homestead. Ruth was insistent that the first time she heard any talk of the right of first refusal was when her sister instituted this suit. The sisters agreed that Ruth had paid Helen $1,000 for conveying her interest in the family homestead but disagreed about what was paid for Helen's conveying her

interest in the Portsmouth property. Ruth pointed out that because the 1938 hurricane damaged the Portsmouth parcel substantially, the family believed that the property was not worth much money. The 1948 conveyance, which had been prepared by a Newport attorney, was executed in Springfield, Massachusetts.

The trial justice described Helen as a credible witness and ruled that "on all the evidence," Ruth and her husband, by joining in as grantors in the 1948 conveyance, had "specifically incorporated" in the 1948 deed the right of first refusal that had been set forth in the 1925 deed from the realty company to the sisters' father. In reaching this conclusion, he has overlooked and misconceived certain pertinent evidence.

The record clearly indicates that Helen and Ruth's father was a moving force in the realty company. The only two lots conveyed to the sisters which were specifically subject to the right of first refusal were the two lots set out in the 1925 deed. Those lots upon which a cottage is presently located are not subject to the $65,000 transaction to which we have previously alluded. The 1933 deed that conveyed title to thirty-nine lots to the sisters was free of restrictions, and a certificate that is part of the 1933 deed affords ample evidence that the realty company's hope for a well-ordered seaside development fell victim to the tumultuous economic times that this country experienced during the late 1920s and the 1930s. The certificate indicated that the conveyance of the thirty-nine lots was to be considered as full payment of a mortgage held by the sisters' father and as part of a stockholder-approved dissolution of the realty company. The record also indicates that the realty company, a Massachusetts corporation, was in fact dissolved by judicial decree in 1935.

One of the witnesses before the trial justice was the attorney who had drawn up the 1948 deed. The attorney, who was described by the trial justice as a "real pro" in the area of conveyancing, testified that if he had intended to give Helen a right of first refusal, he would have expressly set forth this fact in the conveyance. He also insisted that in preparing the 1948 deed, he used the phrase "subject to certain restrictions" as encompassing only those restrictions that regulated the use of the property.

The term "certain" can, if used in a certain context, become uncertain. We are of a mind, especially in light of the conveyancer's testimony, that the reference in the 1948 conveyance to "certain" restrictions in the 1925 deed signifies that the property being conveyed in 1948 was subject to some, but not all, of the restrictions found in the 1925 deed. However, we do not rest our ultimate conclusion on this facet of the testimony. We do fault the trial justice, however, for his failure to consider the first-refusal language explicitly set forth in the 1925 instrument.

■ Helen, in seeking specific performance in the Superior Court, assumed the burden of establishing by clear and convincing evidence the terms of the oral agreement that she sought to enforce. *Ucci v. Mancini*, 115 R.I. 182, 344 A.2d 367 (1975); *Reed v. Rathbun*, 91 R.I. 421, 164 A.2d 387 (1960).

■ Recently, in *Hood v. Hawkins*, 478 A.2d 181 (R.I., 1984), we described the right of first refusal to purchase real estate as an "independent privilege" and a "valuable prerogative" because the owner of the real estate may not sell his property to a ready, willing, and able buyer until the holder of the right signifies a willingness or unwillingness to purchase the property at the price offered by the potential purchaser. Again in *Hood* we emphasized that the grant of a right of first refusal must be specific in regard to the price and other conditions of the sale or provide a means by which the conditions of sale, including the price, can be ascertained with certainty.

With certainty as our guide, we now look to the terms of Helen's first-refusal right

determined by the trial justice to be "specifically" incorporated within the 1948 deed in which four "grantors" conveyed their respective interests in the forty-one lots to two "grantees." As noted earlier, the specific language is to be found in the 1925 conveyance. In essence, the right gives "the grantor" a "prior right to purchase" the grantee's premises for "the same price paid by said grantee, plus an amount equal to a sum which would accrue were the money invested at a reasonable rate of interest." The 1925 phrase "paid by said grantee" is truly ambiguous, for when it is applied to the 1948 conveyance from Helen to her sister, one wonders whether the price for which Helen can purchase the lots conveyed to McNulty is whatever Ruth paid to Helen in 1948 or whatever was owed by the realty company on the mortgage note held by the sisters' father. Again, in 1948 who was to resolve the difference of opinion about what constitutes a reasonable return on investment, and in what time frame were the sisters looking at the investment picture? Was it 1925 or 1948?

The language of the prior right found in the 1925 conveyance suffers from the same infirmities as the first-refusal right asserted in *Hood*. Simply stated, the 1925 verbiage is vague and indefinite and cannot constitute a legally enforceable right of first refusal.

The appeal of Ruth C. Ensworth is sustained, the judgments entered in this cause voiding the sale agreements and conveyances to John W. McNulty are hereby vacated, and the case is remanded to the Superior Court for the entry of a decree denying and dismissing the suit initiated by Helen Wood Doyle.